UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action 16-cr-40008-TSH |
| | ) | |
| MATTHEW CLEM, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE TO THE DEFENDANT'S PRE-SENTENCE REPORT
OBJECTIONS**

Now comes the United States of America, by Carmen M. Ortiz, U.S. Attorney, and Mark J.

Grady, Assistant U.S. Attorney, to respond to the Defendant's Objections to the Pre-Sentence

Report.

**FACTS**[1]

Matthew Clem undertook a years' long effort to sexually exploit vulnerable children.   In

perpetrating this scheme, Clem solicited well over 1,000 individuals, the majority of which the

evidence suggests were minors.   The purpose of this scheme was to obtain pornographic images,

and, if the child was willing, to lure the child to meetings with Clem where he would sexually

exploit them.

To effectuate his scheme, Clem first posed as a teenaged minor on the website "MeetMe,"

a mobile based social networking service.   On MeetMe, Clem posed as a fifteen year old boy.

There, during ensuing chats with minors that Clem met utilizing the fifteen year old profile, Clem

would introduce the subject of both sex and "older men."   If the minor with whom he was chatting

---

[1] Rather than duplicate the extensive description of the offense conduct already set forth in the
PSR (amounting to nearly twenty pages), the government would incorporate that statement of
offense conduct herein, and shall, where appropriate, supplement that statement of facts as
relevant to the matters discussed herein.

was receptive, Clem would then propose to introduce the minor to his "cousin," a nineteen or twenty year old Marine who was returning from active duty (this "cousin" was Clem himself). Clem introduced this "cousin" as "Mark" or "Matt" and would propose that the minor contact "Mark" or "Matt" on Kik Messenger.[2]   *See* Transcript Rule 11 Proceedings, [D. 44], p. 22.

Over 1,200 Kik Messenger chats have been recovered from Clem's cellphone.   Virtually all of these chats, copies of which have been provided under seal to the Court as Government's Sentencing Exhibit 1, involve attempts to solicit pictures and to arrange meetings for sex with the individuals with whom Clem is chatting.   Many of these individuals have provided photos from which it can readily be deduced that they are under eighteen years old.   Several individuals have alluded to being "young" or "younger" than the nineteen or twenty year old age of Clem's "Marine."   Many discuss "sneaking out" to meet Clem once their parents have left home (suggesting individuals under the age of majority who would likely not need parental permission). And, others explicitly identify themselves as being under eighteen years' old.[3]

In addition to the three known victims who are the subject of the charges in this matter (two of whom are victims in pending state Child Rape charges), the government has provided Probation with information regarding several additional individuals who communicated with Clem on Kik Messenger, Juvenile Victim-6 through Juvenile Victim-14 (hereinafter "JV-6" through "JV-14"). These were chats recovered from Clem's iPhone6, the same phone used to exploit the identified victims.

In chats with Clem, JV-6 through JV-14 have identified themselves as minors explicitly or

---

[2]  Kik is a mobile based messaging application.

[3] The government has not contended, either to the Court or Probation, that all of these chats would warrant guideline enhancements.

implicitly, and Clem has nonetheless solicited pornographic images, obtained pornographic images, and/or sought to arrange meetings where sex would occur.

## Guideline Calculations that Are Not Disputed

There is no dispute with respect to the PSR's calculation of the offense levels of the charged conduct.   That is to say, there appears to be no dispute that the offense level as to each known victim, JV-1, JV-3 and JV-5, is 38.   PSR §90-113.   There further appears to be no dispute that these offenses would result in an additional three levels pursuant to the grouping rules, bringing the Total Offense Level to 41.   (Def. Objection, p. 1, "We request that ¶ 175 reflect a reduction from 5 to 3 (which would reflect the multiple count adjustment for the three counts of conviction).").

Thus, there appears to be no dispute that Clem's offense level is at least 41.   With acceptance of responsibility, that would equate to a GSR of 235-293 months (TOL 38 CHC I).

## Disputed Enhancements

The PSR has made two additional enhancements to which Clem objects.   First, it has counted, as relevant conduct, Clem's attempts to exploit, and/or successful exploitation of, individuals identified as JV-6 through JV-14.   PSR §114-172.

Second, Clem objects to the application of the five level Repeat and Dangerous Sex Offender Enhancement.   PSR §176.[4]

---

[4] From a practical standpoint, if the Court upholds the application of the Repeat and Dangerous Sex Offender Enhancement, the Defendant's total offense level would rise to 46 (even without the possibility of two additional level being added based upon the relevant conduct).   With acceptance of responsibility, Clem's offense level would be 43, which results in a GSR of life in CHC I.   If the two additional levels for the relevant conduct are added, the offense level becomes 45, but the GSR of life would not change.

**<u>Clem's Objections</u>**

As regards the issue of Relevant Conduct, Clem objects to Probation's consideration of the JV-6 through JV-14 information and to Probation's use of such Information to enhance Clem's Guideline sentencing range.   Clem contends that the government cannot establish by a preponderance of the evidence that the individuals involved were minors and that the government cannot establish that the information in the chats is reliable.   In this regard, Clem contends that none of the victims have been identified; there is no corroborative evidence; that the government has failed to establish that the victims were minors; and that the defendant did not meet with any of the relevant conduct minors.   Each of these contentions are addressed, in turn, below.

**<u>CHARGED CONDUCT</u>**

There is no substantial dispute concerning Clem's conduct toward the charged victims. *See* Transcript of the Rule 11 proceedings [D. 44].   Those matters will be further addressed in the government's sentencing arguments at the time of sentencing.   Copies of the chats between Clem and JV-1, JV-3 and JV-5, which will be exhibits at sentencing, have been submitted herewith under seal as <u>Exhibits 2 through 4</u>. While not directly relevant to the issue of relevant conduct, those chats provide a context for assessing the chats with the relevant conduct victims.

**<u>UNCHARGED CONDUCT</u>**

**A.    Clem's Communications With JV-6, JV-7, JV-8, JV-9, JV-10, JV-11, JV-12, JV-13, and JV-14 Are "Relevant Conduct"**

In determining the appropriate guideline sentence, this Court is required to consider not only charged conduct, but conduct which the Guidelines define as "relevant conduct."   USSG §1B1.3.   To be properly included as relevant conduct an act must be committed "during the commission of the offense of conviction, in preparation for that offense, or in the course of

4

attempting to avoid detection or responsibility for that offense."   *United States v. Batchu*, 724 F.3d 1, 10 (1st Cir. 2013) (quoting U.S.S.G. §§ 1B1.3 (a)(1), 3D1.2 (d)).   The threshold issue, then, is whether the information relating to JV-6 through JV-14 can be considered "relevant conduct."

The communications with JV-6 through JV-14 occurred during the same time period as the commission of the charged offenses.   Based upon the chats recovered from Clem's iPhone, the government can demonstrate that Clem communicated with the charged victims from April 2014 through March 2015.[5]   Moreover, both JV-3 and JV-5 would testify that they were in contact with Clem for much longer than is reflected in the chats and this is confirmed by Clem's confession. *See also*, Rule 11 Transcript [D. 44], p. 20:18-21; p. 23:19-24; p. 27:24 - p. 30:13; and p. 31:3-6 (in which, among other things, Clem acknowledged communicating with JV-3 from 2012 onward). As specifically noted in the PSR, Clem communicated with (and produced or attempted to produce child pornography of) JV-6 through JV-14 during this same time period.   Thus, the events certainly occurred *during* the commission of the offenses of conviction.

To be clear, the government does not contend that the mere temporal alignment of these events compels a conclusion that Clem's conduct with respect to JV-6 through JV-14 is relevant conduct.   *See, e.g., United States v. Adhers*, 622 F.3d 115, 119-123 (2d Cir. 2010) (suggesting several factors the district court should consider in determining whether conduct is relevant to the production of child pornography including but not limited to temporal proximity and the similarity of the charged and uncharged conduct); *United States v. Wernick*, 691 F.3d 108, 113-117 (2d Cir.

---

[5] Based upon the chats recovered from Clem'siPhone6: (1) Clem communicated with JV-5 at least from April 7, 2014 to June 25, 2014 and from at least September 16, 2014 through March 9, 2015; (2) Clem communicated with JV-3 at least from June 24, 2014 to September 9, 2014; and (3) Clem communicated with JV-1 at least between October 14, 2014 and October 22, 2014.

2012) (temporal proximity alone is not sufficient to establish relevant conduct).   In this case, it is

clear that the victimization of JV-6 through JV-14 occurred not only during the same time period

as the offense conduct, *see supra*, but also that the victimization occurred pursuant to the same

scheme and course of conduct, *i.e.* Clem posing as a fifteen year old on MeetMe to initiate contact

with victims, introducing a "cousin" who was a former Marine, and soliciting images and sexual

meetings.   The facts that the offenses occurred during the same time period and occurred pursuant

to the same criminal scheme establish that this conduct should be considered "relevant conduct."[6]

     Finally, Clem's efforts to entice the charged victims undoubtedly assisted him in preparing

to entice the relevant conduct victims and *vice versa*.   Engaging in this behavior on well over a

1,000 occasions undoubtedly allowed Clem to hone his skills at cajoling and manipulating

unsuspecting minors.   Thus, were more required (and it is not), these acts were committed in

preparation for the offenses of conviction.

### B.    The Information Included as Relevant Conduct Is Reliable

     While Clem contends otherwise, it is difficult to fathom a claim that the Information

---

[6] In *Wernick*, the Second Circuit appeared to agree (citing an unpublished Seventh Circuit Opinion) that events occurring during the same time period and pursuant to the same scheme or plan, should be considered relevant conduct.  *Wernick*, 691 F.3d at 116 n.8 ("The government's only other citation is to an unpublished Seventh Circuit decision, *United States v. Craig*, 420 Fed.Appx. 605, 606 (7th Cir.2011) (citing *Ahders*). That court agreed that any attempt to challenge the inclusion of several uncharged victims as "relevant conduct" under § 1B1.3 would be futile because "they all took place during the same time frame and *as part of the same scheme*." *Id.* (emphasis added). From the few facts stated in the case, it appears that the *Craig* decision is consistent with our own view that activities occurring as part of *the same course of conduct* are relevant; the case does not rely on mere temporal overlap.")   *See also, United States v. Batchu*, 724 F.3d 1, 10 (1st Cir.) *cert. denied*, 134 S. Ct. 663(2013)("There was no allegation that Batchu made the video of Victim C in order to prepare for his liaisons with Minor A or to evade responsibility for those crimes.   Accordingly, for the district court to enhance Batchu's sentence based on the video of Victim C, the video must have been made "during" his relationship with Minor A.")

included by the government as relevant conduct should not be considered "reliable."   There is no reason whatsoever to doubt that the information is exactly what the government has purported it to be, namely, copies of chats between Clem and other individuals on the Kik Messenger application (along with photographs exchanged during those chats) which were recovered from Clem's own iPhone 6.[7]

Clem may certainly seek to challenge the inferences and conclusions to be drawn from such evidence, or whether such evidence alone may sustain the government's burden, but the government would suggest that the defendant cannot fairly claim that this information is not what the government purports it to be.

### C.     Unknown and Unidentified Victims May Be Counted Under the Grouping Rules.

The dispute with respect to relevant conduct concern whether Clem receives a three level enhancement based upon the number of victims, or a five level enhancement.   Probation has concluded that a total of five additional levels should be attributed to Clem under the grouping rules based upon the "relevant conduct."   Clem, in contrast, contends that only three levels should be added under the grouping rules based upon the charged offenses.[8]

Probation has correctly determined that five levels should be added.   First, the application notes for the relevant guideline make clear that each minor exploited counts under the grouping rules, regardless of whether the conduct had been charged.   *See* USSG 2G2.1, Application Note 5

---

[7] The iPhone 6 from which the chats were recovered belonged to Clem and that phone was used to engaged in illicit and unlawful communications with the charged victims.   Copies of those chats are included as Exhibits 2-4.

[8] (Def. Objection, p. 1, "We request that ¶ 175 reflect a reduction from 5 to 3 (which would reflect the multiple count adjustment for the three counts of conviction).")

("For the purposes of Chapter Three, Part D (Multiple Counts), each minor exploited is to be treated as a separate minor. Consequently, multiple counts involving the exploitation of different minors are not to be grouped together under § 3D1.2 (Groups of Closely Related Counts). Subsection (d)(1) directs that if the relevant conduct of an offense of conviction includes more than one minor being exploited, *whether specifically cited in the count of conviction or not,* each such minor shall be treated as if contained in a separate count of conviction.").

Contrary to what is claimed by Clem, there is no requirement that law enforcement identify or interview a purported victim in order for the conduct to be counted under the Guidelines. Indeed, the First Circuit has specifically upheld such an enhancement based upon an unknown victim.   *See Batchu*, 724 F.3d at 6-12.

As detailed below, there is more than a preponderance of the evidence to establish the Clem victimized two or more additional minors.   Thus, a five level enhancement under the grouping rules has been appropriately attributed to Clem by the PSR.

> **D.  Probation Appropriately Determined That Guideline Enhancements Should Apply to the Relevant Conduct Because Those Offenses Have Been Proven By a Preponderance of the Evidence**

As has been established beyond doubt by the defendant's guilty plea, this was a scheme in which Clem posed as a fifteen and sixteen year old boy on MeetMe in order to meet young girls. Needless to say, Clem did not pose as a fifteen year old boy to meet adult women, he did so to meet teen aged girls.   It naturally follows that the persons Clem met were, more likely than not, teenagers themselves.   And, we know beyond doubt that Clem met several teenaged girls pursuant to this scheme, obtained pornographic images from minors, and engaged in sexual encounters with minors, because that is the conduct for which he was convicted.

In the same iPhone in which were found chats with the identified charged victims, were

8

also found thousands of attempts to solicit sexual images and sexual encounters with other young girls, including the chats with the relevant conduct victims.   These chats follow a similar pattern, and often explicitly referenced the scheme pursuant to which Clem met the victims charged in the offenses of conviction.   *See* Exhibit 1.

The government will not re-iterate the summaries of the chats, already detailed in the PSR and copies of which have been provided to the Court as Exhibits.   For JV-6 to JV-14, there are both photographs from which the Court can estimate the ages of the minors and communications in which the young girls (but for JV-9 and JV-11) specifically notify Clem that they are younger than eighteen years old.   Clem points to no reasons why these minor girls would be lying about their ages, nor why both Clem and the juvenile victims, in some instances, would chat about sexual encounters that did not occur.

This Court should not accept the implicit premise of Clem's argument that the relevant conduct ought to be viewed in a vacuum.   Each conversation should be viewed in the context of the admitted facts.   Against a backdrop in which Clem has admitted to repeatedly seeking out underage girls in order to solicit sexual images and sexual encounters it is no leap of logic to conclude that other chats, with individuals self-identifying as minors, were also with underage young girls.

For these reasons, the preponderance of the evidence establishes that Clem communicated with (and produced or attempted to produce child pornography of) JV-6 through JV-14 during this same relevant time period as the offenses of conviction.   In the view of the government, the temporal proximity of the charged and uncharged conduct, the use of a common plan and scheme, along with the similarity of the conduct, and the fact that Clem's "success" with the charged victims likely gave him confidence to engage in the same conduct toward other minor victims,

9

signifies that the following uncharged conduct is relevant conduct to the offenses of conviction.

The content of the chats have been detailed in the PSR and are Exhibits before the Court. The government respectfully suggests that the facts in this case establish, by a preponderance of the evidence, that at least two of the individuals described as JV-6 through JV-14 were real minors from whom Clem attempted to obtain, or obtained, child pornography.   As a result the PSR correctly attributes a five level enhancement based upon the number of victims.

## II.    The PSR Correctly Applies The Five Level Enhancement For A Pattern of Activity Involving Prohibited Sexual Contact

USSG §4B1.5(b) states, in relevant part: "In any case in which the defendant's instant offense of conviction is a covered sex crime . . . and the defendant engaged in a pattern of activity involving prohibited sexual conduct . . . The offense level shall be 5 plus the offense level determined under Chapters Two and Three."

Production of child pornography is a covered sex crime.   USSG §4B1.5, Application Note 2.   Prohibited sexual conduct is defined as "the production of child pornography."   USSG §4B1.5, Application Note 4(A).   A pattern of activity is defined as "at least two separate occasions."   USSG §4B1.5, Application Note 4(B)(i).   In the Rule 11 colloquy alone, even without the relevant conduct, Clem engaged in prohibited sexual conduct on more than one occasion with the identified victims.   For these reasons, the enhancement is correctly applied.

The defendant further objects to the enhancement it as "double counting."[9]   Such argument is without force.   As an initial matter, "[d]ouble counting in the sentencing context is a phenomenon that is less sinister than the name implies….double counting is often perfectly proper…"   *United States v. Lilly*, 13 F.3d 15, 19 (1st Cir. 1994).   Section 4B1.5(b)(1) states that

---

[9] Such a claim raises a different issue than whether the Guideline is appropriately applied, and, may be better considered by the Court under the Section 3553(a) factors.

the enhancement from that section "shall be 5 plus the offense level determined under Chapters Two and Three."   The Sentencing Commission clearly intended for the offense level under Chapters Two and Three to be added to the § 4B1.5(b)(1) enhancement.   If this were double counting, it is intentional, and permitted.   As the First Circuit noted, there is nothing sinister in the Guidelines punishing this conduct more severely.

But even if "double counting" were an issue, there is no concern that Clem is being punished twice for the same conduct under the guideline for production of child pornography and under this enhancement.   Very simply, there is nothing impermissible about the Guidelines adding levels to Clem's offense for engaging in prohibited behaviors against multiple victims and then, in addition, adding levels because he victimized multiple children *on multiple occasions*.

An argument identical to that pressed by Clem in this matter was previously rejected by the Eighth Circuit on exactly these grounds.

> Peck contends that the district court's imposition of a five-level increase pursuant to § 4B1.5(b)(1) for engaging in a "pattern of activity" after the imposition of a three-level, multiple-victim enhancement under § 2G2.1(d)(1) constitutes impermissible double counting because both enhancements are premised upon the same conduct—namely, his sexual exploitation of each of the three minor children. Peck's characterization of the targeted harm is too broad.   The application of § 2G2.1(d)(1) punished Peck for exploiting three different minors, while the § 4B1.5(b)(1) enhancement punished him for exploiting those minors on multiple occasions. *See United States v. Schmeilski*, 408 F.3d 917, 920 (7th Cir.2005) (holding that the application of both § 2G2.1(d)(1) and § 4B1.5(b)(1) does not constitute impermissible double counting).   As such, the separate enhancements for the number of minors Peck exploited and for the fact that Peck exploited the minors on multiple occasions are not premised on the same harm. *See id.* (noting that for a defendant who had on only one occasion photographed three minor children engaging in sexually explicit conduct, § 2G2.1(d)(1) would apply because more than one minor was exploited but § 4B1.5(b)(1) would not because prohibited sexual conduct did not occur on at least two separate occasions). Therefore, because § 2G2.1(d)(1) and § 4B1.5(b)(1) do not address the same kind of harm, the application of both in calculating Peck's sentence did not constitute double counting under these circumstances.

*United States v. Peck*, 496 F.3d 885, 891 (8th Cir. 2007). *See also United States v. Riccardi*, 314 F.

App'x 99, 103 (10th Cir. 2008);

For these reasons, Probation has appropriately added the repeat and dangerous sex offender

enhancement, and, there has been no improper double counting of Clem's criminal behavior.

## <u>CONCLUSION</u>

For the foregoing reasons, the government would request that the Court uphold the

Guideline calculations of the PSR.

Respectfully submitted,
CARMEN M. ORTIZ
UNITED STATES ATTORNEY

By:     */s/ Mark J. Grady*
Mark J. Grady
Assistant U.S. Attorney

## <u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent electronically
to the registered participants as identified on the Notice of Electronic Filing (NEF).

 */s/ Mark J. Grady*
Mark J. Grady, Assistant U.S. Attorney

Dated: July 11, 2016

12